UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| DAVID KRESEL, | Case No. 09-CV-2861 (PJS/SER) |
| Plaintiff, | |
| v. | |
| BNSF RAILWAY COMPANY and BURLINGTON NORTHERN SANTA FE CORPORATION, | ORDER |
| Defendants. | |
| BNSF RAILWAY COMPANY, | |
| Third-Party Plaintiff/ Counterdefendant, | |
| v. | |
| AMERICAN CRYSTAL SUGAR COMPANY, | |
| Third-Party Defendant/ Counterclaimant. | |

Sal A. Spano, Paul B. Edelman, EDELMAN, KRASIN & JAYE PLLC; Michelle J. Looby, Jason S. Kilene, Daniel E. Gustafson, GUSTAFSON GLUEK PLLC, for plaintiff.

Alfonse J. Cocchiarella, Diane P. Gerth, Timothy K. Masterson, Megan K. Ricke, RICKE & SWEENEY, P.A., for defendant/third-party plaintiff/counterdefendant BNSF Railway Company.

Alfonse J. Cocchiarella, Megan K. Ricke, RICKE & SWEENEY, P.A., for defendant Burlington Northern Santa Fe Corporation.

Benjamin J. Hasbrouck, David P. Bunde, FREDRIKSON & BYRON, P.A., for third-party defendant/counterclaimant American Crystal Sugar Company.

Plaintiff David Kresel, an employee of third-party defendant American Crystal Sugar Company ("ACS"), was injured when he fell while operating a railroad switch that was located on the grounds of ACS's plant but that was owned and maintained by defendant BNSF Railway Company ("BNSF"). Kresel cannot sue ACS because of the exclusivity provisions of the Minnesota Worker's Compensation Act. Minn. Stat. § 176.031. But Kresel can and did sue BNSF (as well as defendant Burlington Northern Santa Fe Corporation), bringing two claims: (1) a claim under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51 et seq., and (2) a claim of negligence under state law. BNSF then brought a third-party complaint against ACS seeking contribution and indemnity. ACS, in turn, counterclaimed against BNSF, seeking to recover the amounts that it has paid to Kresel as worker's-compensation benefits.

This matter is before the Court on BNSF's motion for partial summary judgment on a number of issues. The Court has already denied BNSF's motion without prejudice insofar as the motion relates to BNSF's third-party claims against ACS and ACS's counterclaims against BNSF. *See* Docket No. 50. In this order, the Court addresses BNSF's motion insofar as the motion relates to Kresel's claims against BNSF.

BNSF's motion presents two distinct issues with respect to Kresel's claims: (1) Was Kresel, who was indisputably employed by ACS, acting as a "borrowed servant" of BNSF at the time that he was injured? and (2) To the extent that Kresel's state-law claim rests on alleged problems with the ballast on which he was standing when he fell, is the claim preempted by the Federal Railway Safety Act ("FRSA"), 49 U.S.C. §§ 20101 et seq.?

For the reasons described below, the Court concludes that Kresel was not acting as a borrowed servant of BNSF at the time that he was injured and that his state-law claim regarding

the ballast is preempted by the FRSA. Accordingly, the Court grants BNSF's motion for summary judgment insofar as it seeks dismissal of Kresel's FELA claim and his ballast-related negligence claim.

## I. BACKGROUND

ACS produces sugar, molasses, and livestock-feed pellets at its plant in East Grand Forks, Minnesota. Kresel Dep. 16, 26. The plant includes a railyard with trackage to facilitate the loading and shipping of the products. Some of that trackage is owned by ACS, and some of that trackage is owned by BNSF. ACS uses the BNSF-owned trackage pursuant to a written Industry Track Agreement. *See* Ball Aff. Ex. A. BNSF maintains its trackage at the ACS plant, and also inspects ACS's trackage once per year. Hansen Dep. 20. BNSF does not, however, have any employees stationed at the ACS plant. Czapiewski Dep. 61.

At the time of his injury, Kresel worked as a pellet loader for ACS. Kresel Dep. 14-15, 27. As a pellet loader, Kresel would retrieve empty railcars from the ACS yard, inspect and weigh them, load them with feed pellets, weigh them again, and bring them back out to the yard. Kresel Dep. 27-28, 30-31. BNSF brought empty cars to the yard for Kresel and other ACS employees to fill, and BNSF picked up loaded cars from the yard and took them to their destination. Kresel Dep. 28, 31. The schedule for dropping off empty cars and picking up loaded cars was coordinated by third-party distributors. Thorson Dep. 52-54; Czapiewski Dep. 66. When BNSF employees were in the ACS yard — either to drop off or pick up cars — ACS employees were supposed to stay clear of the BNSF operations. Czapiewski Dep. 28-29.

Kresel's foreman at ACS, Henry Czapiewski, told him which empty cars to load and where in the yard to place the loaded cars. Kresel Dep. 32. As a routine part of his job, Kresel

operated railroad switches to direct the movement of cars onto different tracks. Czapiewski Dep. 91. Czapiewski and other ACS employees showed Kresel how to operate the switches. Kresel Dep. 51-52. Neither Kresel nor any other employee of ACS received any kind of training from BNSF. Kresel Dep. 18, 22-25, 33-35, 51-52; Thorson Dep. 48; Czapiewski Dep. 54; Hjerstedt Aff. ¶¶ 5-6. Indeed, Kresel had almost no contact with anyone from BNSF; at most, he would occasionally ask a BNSF employee how many empty cars were being brought into the ACS yard and how long it was going to take to drop them off. Kresel Dep. 35, 147-48.

ACS has two scales for weighing railcars at its plant — a scale in the sugar warehouse and a scale in the pellet-loading area. Czapiewski Dep. 19; Thorson Dep. 48; Kresel Dep. 40. The State of Minnesota tests and certifies ACS's scales once per year. Thorson Dep. 19. ACS's scales are also privately tested and certified two additional times per year through the use of a special railcar, commonly called the "scale car."[1] Thorson Dep. 19-20; Kresel Dep. 43-44. The scale car belongs to BNSF. Kresel Dep. 43; Docket No. 32 at 14. When it is time to certify the scales, BNSF delivers the scale car to the ACS plant. Hjerstedt Aff. ¶ 7. ACS employees then bring the scale car to the scale in the sugar warehouse or to the scale in the pellet-loading area for testing. Kresel Dep. 41; Hjerstedt Aff. ¶ 8.

It is not clear from the record who actually conducts these two additional certifications. BNSF presents evidence that an employee from Webster Scale (a third-party contractor) arranges for the delivery of the scale car to ACS and conducts the certification after the scale car is delivered. Hjerstedt Aff. ¶¶ 7-8. But Kresel testified that BNSF conducts the certification.

---

[1] It is not entirely clear from the record, but it appears that the same scale car may also be used for the state certification.

Kresel Dep. 43. Admittedly, Kresel's testimony on this subject — like some of the questions to which he responded — is vague and confusing, with the attorney asking compound questions and with both the attorney and Kresel frequently using the pronoun "they" without a clear referent. *See* Kresel Dep. 40-44. Nevertheless, Kresel's testimony can reasonably be read to assert that BNSF certified the scales:

> Q: Okay. So they had — what you're telling me is that the railroad had certified their scale cars being accurate or their scales as being accurate?
>
> A: Yeah, they have so they — yes.
>
> Q: And when they bring the scale car to your location, then you — you put it on the scales and certify that your scales are accurate as well?
>
> A: Yeah, they have — they certify it, yeah. . . .
>
> Q: Is that car normally kept on American Crystal Sugar property or is that —
>
> A: Oh, no.
>
> Q: — that car controlled by the railroad?
>
> A: The railroad. They come in like twice a year to —
>
> Q: — and do that?
>
> A: — and certify them, yeah.

Kresel Dep. 40-41, 43.[2]

---

[2] Kresel also points to the testimony of his foreman, Czapiewski, in support of Kresel's contention that BNSF required ACS to use BNSF's scale car to certify the scales. *See* Czapiewski Dep. 75 ("Q: So, so back in, in 2007, BN required ACS to utilize that car at least once a year? A: Yes."). But shortly after giving that testimony, Czapiewski testified that he did not know whether BNSF required ACS to use the scale car. Czapiewski Dep. 79-80 ("Q: Is the
(continued...)

Although this testimony is not entirely clear, the Court regards it as sufficient to create a genuine issue of fact concerning whether BNSF conducted the certifications. Kresel worked at the plant where the certifications were conducted, and it is a reasonable inference that he was present while they were conducted. *See* Kresel Dep. 86 (noting that, after he was injured, his fellow employees assisted with the weighing of the scale car). Kresel was thus in a position to have personal knowledge concerning the identity of the person who actually certified the scales. And when Kresel testified that "[t]hey come in like twice a year" to certify the scales, he is clearly referring to the railroad. Considering Kresel's testimony as a whole, the Court concludes that he has raised a genuine issue of fact concerning whether a BNSF employee conducted the certifications. Therefore, for purposes of ruling on BNSF's motion for summary judgment, the Court will assume that BNSF conducted the certifications.[3]

On September 10, 2007, Czapiewski sent Kresel and another ACS employee to get the scale car after being notified that the sugar warehouse was finished with it. Kresel Dep. 36-37, 42-43. After being used by the sugar warehouse, the scale car had been placed on Track 7, a

---

[2](...continued)
process of the scale car being used to certify your scales, is that required by BNSF? A: I don't know, it might be State of Minnesota maybe. . . . I'm not for sure on that."); *see also* Czapiewski Dep. 86 ("Yeah, I don't know if that's State mandatory or not, I don't know if it's BN, I don't know who it's . . . .").

[3] The Court further notes that, even if the evidence that Webster Scale conducted the certifications were undisputed, it is not at all clear who hires Webster Scale to perform that function. As noted, the state conducts its own certification, so it is reasonable to infer that Webster Scale's certifications are not state-mandated but instead are conducted pursuant to some private contractual arrangement. But the record does not fully disclose the extent and nature of the contractual relationships between Webster Scale, ACS, and BNSF.

BNSF-owned track.[4]  Kresel Dep. 42.  ACS employees used a machine called a trackmobile to move the scale car (and other cars) around the yard.  Kresel Dep. 33-34.  In order to reach the scale car with the trackmobile, Kresel had to throw a switch on Track 7.  Kresel Dep. 45.  BNSF is responsible for maintaining that switch.[5]  Hallgren Dep. 22.  As Kresel threw the switch, it became stuck, causing Kresel to fall and injure his knee.  Kresel Dep. 46-49.  As a result of the accident, Kresel underwent surgery on his knee.  Kresel Dep. 92.  Complications following surgery eventually led to the above-the-knee amputation of Kresel's left leg.  Kresel Dep. 102.

## II.  ANALYSIS

### A.  *Standard of Review*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

### B.  *FELA Claim*

Under the FELA, an interstate railroad is liable for its negligence in causing injury to "any person . . . while he is employed by such [railroad]."  45 U.S.C. § 51.  Thus, to maintain a claim against a railroad under the FELA, the plaintiff must prove that he was employed by that

---

[4]Track 7 is also known as Track 641.  Hallgren Dep. 93.

[5]The Track 7 switch is also known as the 650 switch.  Docket No. 42 at 4.

railroad at the time that he was injured. *See Kelley v. S. Pac. Co.*, 419 U.S. 318, 323 (1974) ("From the beginning the standard has been proof of a master-servant relationship between the plaintiff and the defendant railroad."). BNSF moves for summary judgment on Kresel's FELA claim on the ground that Kresel was not employed by BNSF at the time that he was injured.

The Supreme Court has recognized three circumstances under which a plaintiff may be considered to be employed by a railroad even though he is nominally employed by someone else: (1) the plaintiff may be a "borrowed servant" of the railroad; (2) the plaintiff may be simultaneously employed by both the railroad and his nominal employer; or (3) the plaintiff may be a subservant of a company that is in turn a servant of the railroad. *Kelley*, 419 U.S. at 324. Here, Kresel argues only that he was a borrowed servant of BNSF.[6] Having carefully reviewed the record, the Court finds that no reasonable jury could conclude that Kresel was acting as a borrowed servant of BNSF at the time that he was injured.

Whether an employee of one company (such as ACS) is acting as the borrowed servant of another company (such as BNSF) depends on whose work the employee is performing. *Linstead v. Chesapeake & Ohio Ry.*, 276 U.S. 28, 34 (1928). The answer to that question, in turn, depends on "who has the power to control and direct the [employee] in the performance of [his] work." *Id.* (citation and quotations omitted); *see also Kelley*, 419 U.S. at 324 (citing *Linstead* in discussing the borrowed-servant doctrine); *Shenker v. Balt. & Ohio R.R.*, 374 U.S. 1, 6 (1963) ("under the common law loaned-servant doctrine immediate control and supervision is critical in determining for whom the servants are performing services"); *Vanskike v. ACF indus. Inc.*, 665

---

[6]In his complaint, Kresel also alleges that he was simultaneously employed by BNSF and ACS and that ACS was a servant of BNSF. In his brief opposing summary judgment, however, Kresel contends only that he was a borrowed servant of BNSF.

F.2d 188, 198 (8th Cir. 1981) ("Under the FELA the test of employee status is whether Frisco had control or the right to control Vanskike in the performance of his job."). In determining who has the power to control and direct the employee's work, it is necessary to "carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." *Linstead*, 276 U.S. at 34 (citation and quotations omitted).

Kresel contends that he was a borrowed servant of BNSF at the time of his injury because he was operating a BNSF switch in the course of retrieving a BNSF scale car from a BNSF track so that BNSF could certify ACS's scales for the benefit of BNSF. Kresel compares this case to *Linstead*, in which a conductor for one railroad was found to be a borrowed servant of another railroad while he was conducting a freight train over the second railroad's tracks. *Linstead*, 276 U.S. at 30, 34. But in *Linstead*, there was a critical factor that is not present here: While conducting the freight train over the second railroad's tracks, the conductor in *Linstead* was under the immediate supervision and direction of the second railroad's trainmaster. *Id.* at 34. This was crucial to the Supreme Court's conclusion that the conductor was a borrowed servant. *Id.* at 33-35.

This case is thus distinguishable from *Linstead*, as Kresel was not under the supervision and direction of BNSF at the time that he was injured. This case is, however, indistinguishable in any material respect from a later Supreme Court case — *Shenker v. Baltimore & Ohio Railroad*, 374 U.S. 1 (1963). In *Shenker*, the plaintiff was employed as a janitor by the Baltimore & Ohio Railroad ("B&O") at a railroad station in New Castle, Pennsylvania. *Shenker*, 374 U.S. at 3. Both B&O and a second railroad, the Pittsburgh & Lake Erie Railroad ("P&E"),

owned tracks at the New Castle station, but P&E did not have any employees at the station. *Id.* The plaintiff injured his back while loading mail onto a P&E train from a P&E platform for the benefit of P&E. *Id.* at 3-4. The injury was caused by a faulty door on the P&E train. *Id.* Even though the plaintiff was loading a P&E train from a P&E platform for the benefit of P&E — and was injured by a faulty P&E door — the Supreme Court held that there was "no evidence" to support B&O's argument that the plaintiff was acting as a borrowed servant of P&E. *Id.* at 5-6. Instead, the Court held that the plaintiff was "clearly" an employee of B&O because he was under the sole supervision of B&O at the time that he was injured. *Id.* at 6-7. The Court further explained that, even if the plaintiff had been given direction by a P&E baggageman, such direction was "at most an example of the minimum cooperation necessary to carry out a coordinated undertaking, and . . . cannot amount to control or supervision." *Id.* at 6.

Here, just as in *Shenker*, Kresel was injured by a faulty piece of equipment belonging to BNSF while retrieving BNSF's scale car for the ultimate benefit of BNSF. But, just as in *Shenker*, there is no evidence that Kresel was under the control or direction of BNSF when he retrieved the scale car. Instead, the undisputed evidence establishes that Kresel was exclusively trained and supervised by ACS employees in all of his work activities, including in his operation of the Track 7 switch — and that it was Kresel's foreman, an ACS employee, who instructed Kresel to get the scale car on the day of the accident. The fact that Kresel was retrieving a BNSF scale car for BNSF to use — and the fact that Kresel was on BNSF property when he was injured — does not distinguish this case in any material respect from *Shenker*. *See also Linstead*, 276 U.S. at 33-34 (noting that a worker is not necessarily a borrowed servant simply because he does work that is ultimately for the benefit of the other employer).

Indeed, there is even less reason to find Kresel to be the borrowed servant of BNSF in this case than there was to find the injured worker in *Shenker* to be the borrowed servant of P&E in that case. While the injured worker in *Shenker* was performing a task exclusively for the benefit of P&E, here there is undisputed evidence that certifying ACS's scales benefitted both BNSF and ACS. Czapiewski Dep. 85-86. Moreover, the injured worker in *Shenker* was being directed by a P&E employee in the performance of the task that injured him. But here, there is no evidence that a BNSF employee provided any direction to Kresel on the day of his injury. Czapiewski Dep. 26. Finally, the plaintiff in *Shenker* was employed by a railroad, performed the kinds of tasks that railroad employees typically perform, and performed those tasks for the benefit of both of the railroads that owned tracks at the station. *Shenker*, 374 U.S. at 3. Here, by contrast, Kresel worked for a sugar producer — not a railroad, and not even a company in the transportation industry.[7]

Kresel emphasizes that he and all other ACS employees were kept out of the yard when BNSF employees were present. It is not clear from the record whether it was BNSF or ACS (or both) who instructed the ACS employees to stay out of the way of the BNSF employees. But even if it was BNSF — and even if this instruction could be considered an exercise of BNSF's

---

[7]*Cf. Bradsher v. Mo. Pac. R.R.*, 679 F.2d 1253, 1254-55 (8th Cir. 1982) (finding a genuine factual issue concerning the plaintiff's employment where the plaintiff worked for a subsidiary of the railroad that the railroad operated "as an integral part of its transportation system"); *Ancelet v. Nat'l R.R. Passenger Corp.*, 913 F. Supp. 968, 973-74 (E.D. La. 1995) (finding that the plaintiff was not a borrowed servant and distinguishing cases in which the plaintiff worked for subsidiaries that performed work previously performed by the railroad); Restatement (Second) of Agency § 220(2) (stating that "whether or not the one employed is engaged in a distinct occupation or business" is relevant to the question of whether the worker is an employee); *Kelley*, 419 U.S. at 324 (citing the Restatement (Second) of Agency §§ 220 and 227 in discussing the borrowed-servant doctrine).

control or supervision over ACS employees — this instruction had nothing to do with Kresel's retrieval of the scale car on September 10, 2007. Kresel was not throwing a switch on Track 7 because he was complying with an instruction from BNSF to get away from BNSF employees; he was throwing a switch on Track 7 because he was complying with an instruction from ACS to retrieve the scale car. In short, the fact that BNSF may have kept Kresel out of the yard on other occasions does nothing to prove that Kresel was acting as a borrowed servant of BNSF on the occasion of his injury.

More importantly, keeping ACS employees out of the way of BNSF employees is no more than the type of "minimum cooperation necessary to carry out a coordinated undertaking" — the type of minimum cooperation that the Supreme Court has explicitly distinguished from control or supervision. *Shenker*, 374 U.S. at 6; *see also Ancelet*, 913 F. Supp. at 972 (holding that the cooperation and communication necessary for plaintiff, a pest controller, to treat defendant's railcars was not evidence of supervisory control over the plaintiff). Indeed, the rigid separation between ACS employees and BNSF employees — the standing instruction that ACS employees should *stay away from* BNSF employees — is about as clear an indication as there could be that BNSF did *not* supervise or control ACS employees.

For all of these reasons, the Court concludes that no reasonable jury could find that Kresel was acting as a borrowed servant of BNSF at the time that he was injured. BNSF's motion for summary judgment on Kresel's FELA claim is therefore granted.

*C. Preemption*

Kresel brings state-law claims alleging that BNSF was negligent in a number of ways, including in its selection and configuration of ballast in the area of the Track 7 switch.[8] Specifically, Kresel contends that the ballast was too large, that the ballast was not level with the top of the ties, and that the ballast began sloping downward too close to the ties. Looby Aff. Ex. E ¶¶ 10, 12. Kresel alleges that these defective conditions caused him to fall. BNSF argues that all of Kresel's claims concerning the ballast are preempted by the FRSA — and specifically by 49 C.F.R. § 213.103, which regulates the use of ballast that supports track.

Congress enacted the FRSA to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA provides that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1). To achieve the goal of national uniformity, the FRSA provides that "[a] State may adopt or continue in force a law, regulation, or order related to railroad safety" only "until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106(a)(2). Once the Secretary prescribes such a regulation or order, the state "law, regulation, or order" —

---

[8]"Track ballast is the stone or other material placed underneath and around railroad tracks to provide the structural support, drainage, and erosion protection necessary for safe rail travel." *Nickels v. Grand Trunk W. R.R.*, 560 F.3d 426, 428 (6th Cir. 2009).

including the state's common law — is preempted.[9] *See generally CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 662 (1993).

As noted, the Secretary has issued a regulation governing the use of ballast to support track. *See* 49 C.F.R. § 213.103.[10] Courts are divided over whether § 213.103 preempts state-law negligence claims (or, for that matter, FELA claims[11]) brought by those who were allegedly injured by walking or slipping on track-supporting ballast. *Compare Nickels v. Grand Trunk W. R.R.*, 560 F.3d 426, 428 (6th Cir. 2009) (finding FELA claim that ballast was too large was precluded by § 213.103) *with Grogg v. CSX Transp., Inc.*, 659 F. Supp. 2d 998, 1015-16 (N.D.

---

[9]The FRSA contains two savings clauses that permit certain types of state-law claims. *See* 49 U.S.C. § 20106(a)(2), (b); *Giebel v. Union Pac. R.R.*, No. 08-6294, 2010 WL 1904921, at *5 (D. Minn. May 11, 2010) (describing savings clauses). Kresel has not argued that either savings clause applies in this case.

[10]Section 213.103 provides as follows:

> Unless it is otherwise structurally supported, all track shall be supported by material which will —
>
> > (a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;
> >
> > (b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;
> >
> > (c) Provide adequate drainage for the track; and
> >
> > (d) Maintain proper track crosslevel, surface, and alinement.

[11]Courts have generally agreed that federal FELA claims are *precluded* by the FRSA to the same extent that state-law claims are *preempted* by it. *See Waymire v. Norfolk & W. Ry.*, 218 F.3d 773, 776 (7th Cir. 2000). Thus, although the terminology is different, the analysis is the same.

Ind. 2009) (declining to follow *Nickels* and holding that the plaintiff's FELA claim based on allegedly improper ballast was not precluded).

But Kresel does not appear to dispute that claims regarding ballast used to support a track are preempted under § 213.103. Instead, Kresel claims that § 213.103 is irrelevant because the ballast on which he slipped was *not* used to support a track. According to Kresel, the ballast on which he slipped was on a walkway next to a track, and did not support a track. Kresel points out that other courts have held that claims concerning walkway ballast are not preempted by § 213.103. *See Davis v. Union Pac. R.R.*, 598 F. Supp. 2d 955, 955, 959 (E.D. Ark. 2009) (holding that FELA claim was not precluded where "[t]he area in which plaintiff was walking does not support any track or track bed"); *Kelly v. Ill. Cent. R.R.*, No. 08-1052, 2010 WL 271959, at *7-8 (C.D. Ill. Jan. 12, 2010) (holding that FELA claim was not precluded because the plaintiff's claims encompassed ballast in the yard and were not limited to track-supporting ballast). As Kresel has framed the issue, then, whether his claim is preempted by § 213.103 turns on whether the ballast on which he was standing when he fell was track-supporting ballast or walkway ballast.

The Track 7 switch is affixed to two extended railroad ties that are part of Track 7. *See* Gerth Suppl. Aff. Ex. H (Ex. 5 to Kresel's deposition, which is a photograph of the Track 7 switch); Kresel Dep. 70-71 (identifying Exhibit 5); *see also* Hr'g Tr. 36, Nov. 8, 2010 (plaintiff's counsel stating that "the two ties come out perpendicular from, obviously, the track proper, the track itself"). When Kresel threw the switch, he was standing on the ground immediately adjacent to the end of the railroad ties supporting the switch; the markings on Exhibit 5 to

Kresel's deposition demonstrate where Kresel placed his feet.  Kresel Dep. 47-48, 70-71; Gerth Suppl. Aff. Ex. H (markings showing where Kresel placed his feet).

Based on the photograph of the switch, the Court finds that the switch was located on railroad ties that were part of the track and supported by the track bed.  The Court further finds that the area where Kresel was standing — that is, the ground immediately adjacent to the end of the ties supporting the switch — was also part of the track bed and supported the track.  The Court's finding is bolstered by undisputed testimony that the ballast configuration around the switch stand was necessary for drainage, which is one of the functions of the ballast required by § 213.103.  *See* Hansen Dep. 113-14 (ballast configuration at the end of the switch ties is necessary for drainage to prevent water accumulation between the ties); Hallgren Dep. 63 ("You got to have some drainage around your stand, too.  You got to have a little bit of a slope there so you — the water runs away from it . . . .").  Indeed, Kresel's expert does not appear to dispute that the ballast around the switch ties was part of the support structure of the track; to the contrary, he seems to concede the point when he states that "the ballast in this area . . . appeared to be adequate and sufficient to" fulfill the purposes of § 213.103.  Looby Aff. Ex. E ¶ 11.

Kresel's argument that he was standing on a walkway relies mainly on an internal BNSF engineering diagram depicting a standard industry track and labeling an area of the track bed as "walkway."  *See* Looby Aff. Ex. E at 21.  But the fact that an internal engineering diagram labels an area of a standard track bed as "walkway" does not mean that the area is not part of the support structure of the track.  To be sure, there must be some outer limit to the track-support structure; a railroad could not build a track bed the size of, say, a football field, and claim that all claims regarding the track bed were preempted by § 213.103 because the entire bed supported

the track. For this reason, had Kresel been standing further away from the ties, the Court might conclude that there was a genuine issue of fact about whether the ballast on which Kresel slipped was part of the track's support structure. But in this case, it is undisputed that Kresel was standing immediately adjacent to the end of two ties that were themselves part of the track, and it is undisputed that the ballast on which Kresel was standing when he slipped was serving the functions described in § 213.103. Under these circumstances, a reasonable jury would have to conclude that the ballast on which Kresel was standing when he slipped was track-supporting ballast that was subject to the requirements of § 213.103. Kresel's ballast-related claim is therefore preempted by § 213.103.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. The motion of defendant BNSF Railway Company for partial summary judgment [Docket No. 30] is GRANTED IN PART.

2. The motion is GRANTED with respect to the following claims:

    a. Plaintiff David Kresel's claim under the Federal Employers' Liability Act; and

    b. Plaintiff David Kresel's state-law negligence claim insofar as that claim alleges defects in the size, level, and slope of the ballast used under and around the Track 7 switch.

3. The claims identified in paragraph 2 are DISMISSED WITH PREJUDICE AND ON THE MERITS as against defendant BNSF Railway Company.

4. Pursuant to the Court's November 8, 2010 order [Docket No. 50], the remainder of the motion is DENIED WITHOUT PREJUDICE.

Dated: April 15, 2011  s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge